**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JUWAHN THOMAS, | |
| Appellant | No. 1062 EDA 2014 |

Appeal from the Judgment of Sentence of November 15, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007231-2010 and CP-51-CR-0007264-2010

BEFORE:  DONOHUE, OLSON AND MUSMANNO, JJ.

MEMORANDUM BY OLSON, J.:                **FILED MAY 06, 2015**

Appellant, Juwahn Thomas, appeals from the judgment of sentence entered on November 15, 2013, as made final by the denial of post-sentence motions on March 17, 2014.  We affirm.

The trial court summarized the factual history in this matter as follows:

After midnight on May 2, 2010, Kelly Rindone (Rindone) and her boyfriend, Tyreece Bumpers (Bumpers), drove to Brian's Sports Bar in the Frankford neighborhood in Philadelphia, PA.  The couple was seated at the bar when an acquaintance named Vonnie introduced them to her aunt, Janet.  After Bumpers finished his drink and the bartender informed the patrons that the bar was about to close, "Aunt Janet" asked Rindone and Bumpers for a ride home; the couple obliged.

With Rindone sitting in the front passenger seat, Bumpers drove Aunt Janet to 4911 Penn Street.  Immediately after the couple dropped off Aunt Janet but before they drove away, Rindone's phone rang; the name "Bishop" appeared on her phone. Rindone knew "Bishop" as a drug dealer with whom Bumpers

had engaged in drug-related business in the past. Prior to going to jail in October 2009, Bumpers had sold drugs on the same block where the couple had just dropped off Aunt Janet – the 4900 block of Penn Street. According to Rindone, "[Bumpers's] area – his area, I'm sorry, was 4900 Penn Street." According to Rindone, after spending roughly six months in prison from October 2009 until March 2010, Bumpers returned to the streets and resumed selling drugs: "He had his own clientele. When people saw him out of jail, they would buy from him when they saw him."

Having noticed the name "Bishop" on Rindone's phone, Bumpers pulled the phone from Rindone's hand. Bumpers picked up the call and the two men began to argue; Rindone could hear that they were arguing about money. Bumpers exited the car and continued to talk on the phone. As Bumpers stood on the street across from 4911 Penn Street, a "crack addict" walked towards the front steps of 4911 Penn Street, where a man named Lonnie was seated. "There was somebody that came up to Lonnie, and I assumed it was going to be a drug exchange[.]" But before a drug transaction occurred, Bumpers called out to the "crack addict," stating "Let me holler at you." Rindone thought that Bumpers summoned the "crack addict" away from Lonnie in an attempt to learn "what he was buying and probably what the other person had." Rindone believed that Bumpers wanted to know what kind of drugs were being sold, by whom, and at what price.

The "crack addict" turned away from Lonnie and crossed the street in Bumper's direction. But before reaching Bumpers, [Appellant] emerged from 4911 Penn Street, angered. [According to Rindone:]

[Appellant] came out of the direction of Vonnie's house and he was walking over to the car, and he was loud and he was yelling and there was words exchanged and he said, man— I'm sorry. I'm sorry. I need a minute. And as he came over to my car, my car was parked, the windows were down.

[Bumpers], at this point, was back inside of the car. [Appellant] was standing at the window. There was no room. It was the car and the window and the window and the window was down. I seen [sic] his face. I looked right

in his face. And [Bumpers] and [Appellant], they argued and words were exchanged, "Don't play with me, get the f**k out of here." And when the words were done being exchanged, before I knew it, that man right there, he pulled out a gun and he started shooting.

Rindone indicated that [Appellant] approached Bumpers, yelling "Don't play with me. Don't play with me," to which Bumpers responded, "Get the f**k out of here." [Appellant] replied, "I'll show you get the f**k out of here," and then pulled out a gun and fired repeatedly at a downward angle toward Bumpers, striking him ten times. Bumpers suffered gunshot wounds to his jaw, abdomen, torso, arms and hand; four of those gunshot wounds were inflicted by bullets fired from close range—less than two-and-a-half feet away.

Trial Court Opinion, 9/26/14, at 1-4 (record citations and footnotes omitted).

At the conclusion of trial on November 15, 2013, the jury found Appellant guilty of first-degree murder, aggravated assault, and possession of an instrument of crime (PIC).[1] Immediately thereafter, the trial court imposed a mandatory sentence of life imprisonment on Appellant.[2] Appellant filed post-sentence motions on November 19, 2013. On March 17, 2014, the trial court denied Appellant's post-sentence motions. This timely appeal followed.[3]

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 2702, and 907(a), respectively.

[2] In addition, the court ordered Appellant to serve consecutive terms of nine to 20 years' imprisonment for his aggravated assault conviction and one to five years for his PIC conviction.

[3] Both the trial court and Appellant satisfied the requirements of Pa.R.A.P. 1925.

Appellant's brief raises the following questions for our review:

A.  DID THE TRIAL COURT COMMIT AN ABUSE OF DISCRETION BY OVERRULING A MOTION FOR A MISTRIAL PROMPTED BY THE PROSECUTOR'S UNSUBSTANTIATED CLAIM THAT THE KILLING WAS PRECIPITATED BY A DRUG FEUD AND THAT APPELLANT SOLD DRUGS?

B.  DID THE TRIAL COURT COMMIT AN ABUSE OF DISCRETION BY OVERRULING AN OBJECTION PROFFERED AFTER THE PROSECUTOR ARGUED DURING HIS CLOSING SPEECH THAT [] APPELLANT COULD HAVE SUBPOENAED CELL PHONE RECORDS THEREBY IMPERMISSIBLY PLACING A BURDEN OF HAVING TO PRODUCE EVIDENCE ON APPELLANT?

C.  DID THE TRIAL COURT ERR BY OVERRULING AN OBJECTION TO THE ADMISSION OF A STATEMENT GIVEN BY KELLY RINDONE UNDER THE PRIOR CONSISTENT STATEMENT RULE BECAUSE THE STATEMENT IN QUESTION WAS GIVEN AFTER SHE GAVE THE PRIOR STATEMENT ON WHICH SHE WAS IMPEACHED?

Appellant's Brief at 3.

We have carefully reviewed the certified record, the submissions of the parties, and the trial court's thorough Rule 1925 opinion. Based upon our review, we conclude that the trial court adequately and accurately addressed the contentions Appellant raises on appeal and correctly determined that no relief is due. For these reasons, we adopt the trial court's September 26, 2014 opinion as our own and direct the parties to include the trial court's opinion with all future filings relating to our disposition in this matter.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/6/2015</u>

PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH                          :

                                      :        CP-51-CR-0007231-2010
                                               CP-51-CR-0007264-2010
        v.

                                               Superior Court Docket
                                               No.:
JUWAHN THOMAS                  1062 EDA 2014

Sarmina, J.
September 26, 2014        7203959631          FILED

                                               SEP 2 6 2014
                        OPINION          Criminal Appeals Unit
                                         First Judicial District of PA
PROCEDURAL HISTORY

On November 15, 2013, following a jury trial[1] before this Court, Juwahn Thomas (hereafter,

the defendant) was found guilty of murder of the first degree (H-1), aggravated assault (F-1), and

possessing instruments of crime (PIC) (M-1).[2] That same day, this Court imposed the mandatory

sentence[3] of life imprisonment for murder of the first degree.[4] On November 19, 2013, the

defendant filed post-sentence motions. On March 17, 2014, this Court denied the defendant's post-

sentence motions. This timely appeal followed.

FACTS

After midnight on May 2, 2010, Kelly Rindone (Rindone) and her boyfriend, Tyreece

Bumpers (Bumpers), drove to Brian's Sports Bar in the Frankford neighborhood in Philadelphia,

---

[1] The defendant was represented at trial by William Bowe, Esquire.

[2] 18 Pa.C.S. §§ 2502(a), 2702, and 907(a), respectively.

[3] 18 Pa.C.S. § 1102(a).

[4] As to the conviction for aggravated assault, this Court sentenced the defendant to a consecutive term of not less than nine years nor more than 20 years confinement. Notes of Testimony (N.T.) 11/15/2013 at 49-50. As to the conviction for PIC, this Court sentenced the defendant to a consecutive term of not less than one year nor more than five years confinement. Id. at 49.

1



PA. Notes of Testimony (N.T.) 11/13/2013 at 63, 66. The couple was seated at the bar when an acquaintance named Vonnie introduced them to her aunt, Janet. Id. at 67. After Bumpers finished his drink and the bartender informed the patrons that the bar was about to close, "Aunt Janet" asked Rindone and Bumpers for a ride home; the couple obliged. Id.

With Rindone sitting in the front passenger seat, Bumpers drove Aunt Janet to 4911 Penn Street. Id. at 67-68, 86. Immediately after the couple dropped off Aunt Janet but before they drove away, Rindone's phone rang; the name "Bishop" appeared on her phone. Id. at 68, 102. Rindone knew "Bishop" as a drug dealer with whom Bumpers had engaged in drug-related business in the past.[5] Id. at 102, 113. Prior to going to jail in October 2009, Bumpers had sold drugs on the same block where the couple had just dropped off Aunt Janet – the 4900 block of Penn Street.[6] N.T. 11/13/2013 at 113. According to Rindone, "[Bumpers's] area – his area, I'm sorry, was 4900 Penn Street." Id. According to Rindone, after spending roughly six months in prison from October 2009 until March 2010, Bumpers returned to the streets and resumed selling drugs: "He had his own clientele. When people saw him out of jail, they would buy from him when they saw him."[7] Id.

Having noticed the name "Bishop" on Rindone's phone, Bumpers pulled the phone from Rindone's hand. Id. at 68. Bumpers picked up the call and the two men began to argue; Rindone

---

[5] This evidence was admitted via an earlier statement by Rindone to police pursuant to Brady/Lively. Commonwealth v. Brady, 507 A.2d 66 (Pa. 1986); Commonwealth v. Lively, 610 A.2d 7 (Pa. 1992); see Pa.R.E. 803.1(1)(B) ("A prior statement by a declarant-witness that is inconsistent with the declarant-witness's testimony and: (B) is a writing signed and adopted by the declarant;"). Rindone testified with certainty that the defendant was the perpetrator of this crime. She described him to police as being roughly six-feet tall with a dark complexion, braided hair, and tattoos of bricks on his arms. N.T. 11/13/2013 at 75. "We lived on the same street for about a year or so. I would see him – to say every day, maybe not every day but every other day we seen [sic] each other in passing. We lived across the street from one another." Id. at 76. Rindone testified that there was a period of time when she lived at 4909 Penn Street and the defendant lived at 4910 Penn Street. Id. at 85-90, 96.

[6] This was also admitted pursuant to Brady/Lively; Pa.R.E. 803.1(1)(B).

[7] This was also admitted pursuant to Brady/Lively; Pa.R.E. 803.1(1)(B).

could hear that they were arguing about money.[8] Id. at 81. Bumpers exited the car and continued to talk on the phone. Id. at 68. As Bumpers stood on the street across from 4911 Penn Street, a "crack addict"[9] walked towards the front steps of 4911 Penn Street, where a man named Lonnie was seated. N.T. 11/13/2013 at 68-69, 89. "There was somebody that came up to Lonnie, and I assumed it was going to be a drug exchange[.]" Id. at 69. But before a drug transaction occurred, Bumpers called out to the "crack addict," stating, "Let me holler at you." Id. Rindone thought that Bumpers summoned the "crack addict" away from Lonnie in an attempt to learn "what he was buying and probably what the other person had." Id. at 79. Rindone believed that Bumpers wanted to know what kind of drugs were being sold, by whom, and at what price. Id. at 107.

The "crack addict" turned away from Lonnie and crossed the street in Bumpers's direction. Id. at 69. But before reaching Bumpers, the defendant emerged from 4911 Penn Street, angered. N.T. 11/13/2013 at 69, 90, 108.

> [The defendant] came out of the direction of Vonnie's house and he was walking over to the car, and he was loud and he was yelling and there was words exchanged and he said, man – I'm sorry. I'm sorry. I need a minute. And as he came over to my car, my car was parked, the windows were down.
>
> [Bumpers], at this point, was back inside of the car. [The defendant] was standing at the window. There was no room. It was the car and the window and the window was down. I seen [sic] his face. I looked right in his face. And [Bumpers] and [the defendant], they argued and words were exchanged, "Don't play with me, get the fuck out of here." And when the words were done being exchanged, before I knew it, that man right there, he pulled out a gun and he started shooting.

Id. at 69.

Rindone indicated that the defendant approached Bumpers, yelling "Don't play with me. Don't play with me," to which Bumpers responded, "Get the fuck out of here." Id. at 78-79. The

---

[8] Detective James Burns interviewed Rindone a few hours after the shooting. N.T. 11/14/2013 at 77-78. During that interview, Rindone specified that she overheard Bishop tell Bumpers that he was owed $500; according to Rindone, Bumpers disputed that figure, arguing that he only owed $150. Id. at 85.

[9] Rindone described this individual as a "fiend." N.T. 11/13/2013 at 69, 79. Rindone explained that by "fiend," she meant that this individual was a "crack addict." Id. at 106-08.

3

defendant replied, "I'll show you get the fuck out of here," and then pulled out a gun and fired repeatedly at a downward angle toward Bumpers, striking him ten times. Id. at 47, 79. Bumpers suffered gunshot wounds to his jaw, abdomen, torso, arms and hand; four of those gunshot wounds were inflicted by bullets fired from close range – less than two-and-a-half feet away.[10] Id. at 41-47.

## LEGAL ANALYSIS

The defendant raises five issues on appeal.[11] This Court will address the defendant's claims *seriatim*.

1. This Court abused its discretion by overruling a motion for a mistrial, as the prosecutor failed to provide evidence to support his assertion during his opening statement that the defendant killed Bumpers because of a drug feud.

2. This Court abused its discretion by overruling a motion for a mistrial following this Court's "*sua sponte* castigation of defense counsel" during defense counsel's closing argument.

3. This Court abused its discretion by overruling a motion for a mistrial based on the prosecutor's comment during closing argument that "indicated that a vehicle was unmarked and had tinted windows" despite the absence of evidentiary support for that statement.

4. This Court abused its discretion by overruling an objection after the prosecutor improperly stated that the defendant could have subpoenaed cell phone records. The prosecutor's statement improperly shifted the burden to produce evidence to the defendant.

5. This Court abused its discretion by admitting Kelly Rindone's statement as a "prior consistent statement" because she had given the statement in question *after* giving the statement on which she was impeached.

---

[10] One bullet fired from close range passed through the back of Bumpers's left arm into his torso and fractured his backbone; another bullet fired from close range traveled from Bumpers's left arm into his torso, where it caused significant injury to his lungs and to his heart; a third bullet pierced the left side of Bumpers's torso and went through his liver. N.T. 11/13/13 at 43-45.

[11] These claims have been rephrased and reordered for ease of disposition.

4

1. This Court abused its discretion by overruling a motion for a mistrial, as the prosecutor allegedly failed to provide evidence to support his assertion during his opening statement that the defendant killed Bumpers because of a drug feud.

The defendant claims that this Court erred by overruling the defendant's motion for a mistrial based on the prosecutor's alleged failure to produce evidence to support his statement to the jury that the defendant was motivated to kill Bumpers because of a drug feud. The defendant contends that the record "is devoid of any evidence" to support the prosecutor's allegations that "the killing was precipitated by a drug feud and that [the defendant] sold drugs." 1925(b) Statement, 4/15/2014 at ¶ 1. As the prosecutor's statement was, in fact, supported by the evidence introduced at trial, the defendant's claim fails. And assuming, *arguendo*, that the prosecutor fell short of fully supporting the statement that he made during his opening statement, his failure to do so did not rise to the level of warranting a mistrial. The defendant's claim fails.

In a criminal prosecution, an opening statement provides an opportunity for the prosecutor to preview the background of the case as well as the facts that he intends to prove. Commonwealth v. Parker, 919 A.2d 943, 950 (Pa. 2007). "A prosecutor's opening statements may refer to facts that he reasonably believes will be established at trial." Id., *citing* Commonwealth v. Begley, 780 A.2d 605, 626 (Pa. 2001). The scope of material that may be presented in an opening statement is limited by that which the prosecutor believes, in good faith, will be available and admissible. Id. at 950 n.8, *citing* Commonwealth v. Fairbanks, 306 A.2d 866, 868 (Pa. 1973); see also Commonwealth v. Russell, 326 A.2d 303, 307 (Pa. 1974) (holding that, even though the prosecutor "did not expressly demonstrate the promised motive" from his opening statement, his failure to do so did not warrant a mistrial because his mention of motive "d[id] not indicate bad faith or an attempt to prejudice the jury"); cf. Commonwealth v. Culver, 51 A.3d 866, 879 (Pa.Super. 2012) (upholding the trial court's decision to grant a mistrial based on prosecutorial misconduct where the prosecutor referred, in his opening statement, to evidence that he invented; ultimately, such evidence did not exist).

5

A prosecutor's opening address is improper only where he refers to proffered evidence which he knows will not be available. Absence of a good faith and reasonable basis for believing that such evidence would be available is necessary before we will hold that a defendant is entitled to a new trial based upon prosecutorial misconduct in making an opening statement.

Commonwealth v. Johnson, 429 A.2d 718, 721 (Pa.Super. 1981).

In the case *sub judice*, the prosecutor's remarks about the defendant's motive to kill Bumpers were supported by the evidence introduced at trial. The prosecutor informed the jury that evidence would be presented indicating that there was "bad blood" between the defendant and Bumpers, stemming from an incident which enabled the defendant to sell drugs in the area where Bumpers had previously sold drugs: "This isn't, wasn't and never will be a whodunit. Juan did this.[12] They'd been beefing, and you'll hear that it was over – don't be shocked – drugs and money. They've been beefing." N.T. 11/13/2013 at 26.

The prosecutor continued:

We don't have to prove motive. But that's not to say you won't get evidence of motive. You'll hear it. You'll hear that they had been beefing over money. That there was much bad blood between the two. That they had beefed over drug sales. That they had beefed over the theft of some of the victim's drugs. That they had beefed over an incident that happened six months earlier that got Tyreece Bumpers locked up for six months resulting in – resulting in the defendant then being able to sell on that block where Tyreece Bumpers had been selling.

When the defendant – when the victim, Mr. Bumpers, was released, that wasn't very good for the defendant. He wasn't happy about this. I tell you this for two reasons. I tell you this because you are entitled and should want to hear evidence of motive. I tell you before I sit down, because I'm a worrier by nature, I worry that instead of looking at the evidence in this case, what happened to Tyreece Bumpers, who did it and how he did it, and the fact that he was unarmed, you could hear that it was over drugs and have that affect your decision ultimately in a way that is not appropriate.

Id. at 28-29.

---

[12] The court reporter apparently has misspelled the defendant's name. The way it appears in the transcript makes it seem like it had a Spanish pronunciation, which it did not.

The evidence introduced at trial supported the prosecutor's assertion that the jury would receive "evidence of motive" – that the defendant was angered by Bumpers's return to the drug trade, in the precise area where the defendant stepped in and sold drugs once Bumpers went to jail.

First, there was substantial evidence connecting Bumpers to the drug trade on and around 4900 Penn Street. Evidence was elicited showing that, prior to October 2009, Bumpers had exerted some degree of control over the drug trade on the 4900 block of Penn Street: Rindone stated that Bumpers had sold drugs there, describing that block as "his area." After being released from jail, Bumpers returned to the drug trade: Rindone told police that, upon being released from prison, Bumpers resumed selling drugs to "his own clientele."[13] When Rindone received a phone call from "Bishop," a known drug dealer, Bumpers pulled the phone from her hand, exited the vehicle, and began to argue with Bishop about money. If Bumpers's phone conversation had not already alerted those in his immediate vicinity to the fact that he was conducting drug-related activity, his next act did. Bumpers summoned the "crack addict" who had approached 4911 Penn Street, yelling "Let me holler at you." One could reasonably infer, as Rindone did, that Bumpers called out to the "crack addict" to gain information about the drug trade on the 4900 block of Penn Street.

Second, evidence suggested that individuals who lived around 4911 Penn Street filled the void in the drug trade left by Bumpers's absence: the fact that a "crack addict," roaming the 4900 block of Penn Street, approached a man named Lonnie on the stairs of 4911 Penn Street indicated that individuals in that vicinity had drugs available for sale. In fact, that is precisely what Rindone thought when she saw the "crack addict" walking towards Lonnie: "I assumed it was going to be a drug exchange." The evidence connecting the defendant to that potential drug sale came from Rindone, who testified that she saw the defendant emerge from the house that the "crack addict" had approached – 4911 Penn Street.

---

[13] As noted *supra*, Rindone said this in an earlier statement to police. It was admitted pursuant to Brady/Lively; Pa.R.E. 803.1(1)(B).

7

Finally, evidence plainly showed that the defendant's motive was tied to Bumpers's involvement in a potential drug transaction on the defendant's block. As soon as Bumpers summoned the "crack addict" away from 4911 Penn Street, the defendant emerged from that residence in a huff. The defendant immediately confronted Bumpers. The fact that the defendant became so hostile so quickly suggested that the defendant was enraged by Bumpers's interference with the drug transaction. Thus, the evidence supported the prosecutor's assertion that the defendant's motive to kill Bumpers was rooted in a drug-related "beef."

But, even if the prosecutor's assertion about the prior incident – the alleged drug feud between Bumpers and the defendant – was not supported by evidence presented at trial, a mistrial still would not have been appropriate. The prosecutor had a good faith basis for believing that such evidence would be presented. A statement made by Yvonda Mandy (Vonnie) 24 hours after the killing, on May 3, 2010 – discussed a prior incident between Bumpers and the defendant that presented a motive for the homicide.[14] At trial, the prosecutor explained that at the time of opening statements, he planned to call Vonnie, whose detailed statement regarding the prior incident was later recanted. N.T. 11/14/13 at 122. Upon re-evaluation of the recantation, the prosecutor made the decision during trial not to call Vonnie. Id.

Because the statement made by the prosecutor in his opening statement was later supported by evidence at trial, this claim fails.

---

[14] In her statement, Vonnie stated that she knew the defendant was beefing with Bumpers. Id. at 123. The statement recounts an incident where Bumpers came into her house with a gun, and was "trying to hold people hostage over some drugs that were missing." Id. at 124. During that incident, Bumpers called the defendant out for stealing his drugs, and both Bumpers and the defendant had guns. Id. at 125. This incident had resulted in Bumpers going to jail for six months. N.T. 11/14/13 at 125.

8

2. This Court abused its discretion by overruling a motion for a mistrial following this Court's "*sua sponte* castigation of defense counsel" during defense counsel's closing argument.

The defendant claims that this Court abused its discretion by overruling a motion for a mistrial following this Court's "*sua sponte* castigation of defense counsel" during defense counsel's closing argument. 1925(b) Statement, 4/15/2014 at ¶ 3. This claim fails.

"A mistrial is granted only under manifest necessity." Commonwealth v. Collins, 70 A.3d 1245, 1253 (Pa.Super. 2013). A mistrial should not be granted unless an incident is "of such a nature that its unavoidable effect is to deprive appellant of a fair trial." Id., *citing* Commonwealth v. Johnson, 815 A.2d 563, 576 (Pa. 2002). A trial court is permitted to rectify any prejudicial event by means less drastic than granting a mistrial. Id. Additionally, a trial court may *sua sponte* give a cautionary instruction to the jury to disregard remarks made by a prosecutor or defense attorney in order to cure potential prejudice. Commonwealth v. Chimenti, 524 A.2d 913, 924 (Pa.Super. 1987), appeal denied, 533 A.2d 711 (Pa. 1987).

Immediately following defense counsel's closing argument, this Court stated:

THE COURT: Members of the jury, Mr. Bowe asked you to do something for him and to defend his client. Members of the jury, you are not here to do something for Mr. Bowe and you are not here to do something for Mr. Sax. You are here to honor your oath and to fairly and impartially consider all of the evidence and then make your decision.

N.T. 11/14/13 at 210-11.

This instruction to the jury was made following defense counsel's closing argument, in which he had said to the jury: "[s]o I must rely on you [the jury] to defend Mr. Thomas in a very real way." N.T. 11/14/13 at 209. Defense counsel also stated: ". . . if that's what he [the prosecutor] argues to you, you need to say in my stead, well, what about Officer Johnson[?] . . . then you take up my part. What would I say? . . . You must make that argument if he claims Miss Rindone was a truth teller." Id. at 209.

9

This Court's instruction to the jury was made to cure any potential prejudice that may have resulted from defense counsel's comments. The instruction was far from a "castigation of defense counsel." It merely instructed the jury of its duties – to fairly and impartially consider all of the evidence and make a decision – without consideration of defense counsel's improper comments. Because there was no improper conduct by this Court, this claim fails.

**3. This Court abused its discretion by overruling a motion for a mistrial based on the prosecutor's comment during closing argument that "indicated that a vehicle was unmarked and had tinted windows" despite the absence of evidentiary support for that statement.**

The defendant claims that this Court abused its discretion by overruling a motion for a mistrial based on the prosecutor's statement during closing argument that Rindone had been transported to the scene of the crime in a car with tinted windows "despite the absence of evidentiary support for the comment." 1925(b) Statement, 4/15/2014 at ¶ 4. This claim fails.

A prosecutor has "considerable latitude" during a closing address so long as his arguments are supported by the evidence introduced at trial or reasonable inferences therefrom. Commonwealth v. Judy, 978 A.2d 1015, 1020 (Pa.Super. 2009). "A prosecutor does not engage in misconduct when his statements are based on the evidence or made with oratorical flair." Commonwealth v. Carson, 913 A.2d 220, 237 (Pa. 2006).

The evidence presented at trial established that the police transported Rindone to the scene of the crime in an unmarked car with tinted windows in order to identify the defendant's residence. Detective James Burns testified that he took a statement from Rindone a few hours after the shooting. N.T. 11/14/2013 at 77-78. During that interview, Rindone indicated that she knew which house the defendant lived in along Penn Street, but could not recall the corresponding house number extemporaneously. Id. at 90-91. Rindone offered to travel to the area and point out the correct house. Id. On cross-examination, Detective Burns stated that he drove Rindone in an unmarked car with tinted windows to Penn Street, where she pointed out the defendant's home:

10

DETECTIVE BURNS: It's also my recollection that during the course [sic] we did take her out in a car with – **unmarked car with tinted windows** and she did point out the house.
MR. BOWE: She pointed out a house –
DETECTIVE BURNS: On the 4900 block of Penn Street.

Id. at 91 (emphasis added).

In his closing argument, the prosecutor referred to the aforementioned testimony:

ADA SAX: You can talk about real life or you can talk about sanitized trials. Yeah, we brought her back in an unmarked car with tinted windows. Why do you think that is?
MR. BOWE: Objection, Your Honor.
THE COURT: Overruled.
ADA SAX: With Lonnies and fiends, Vonnies and Bishop and Foffy maybe, and the defendant still out there, why do you think they bring her back in a tinted window, unmarked car?

Id. at 221.

As Detective Burns testified that he transported Rindone to the defendant's house in an unmarked car with tinted windows, the prosecutor's statement was plainly supported by the evidence introduced at trial. Accordingly, this Court properly denied the defendant's motion for a mistrial.

**4. This Court abused its discretion by overruling an objection after the prosecutor improperly stated that the defendant could have subpoenaed cell phone records. The prosecutor's statement improperly shifted the burden to produce evidence to the defendant.**

The defendant claims that this Court abused its discretion by overruling an objection after the prosecutor improperly stated that the defendant could have subpoenaed cell phone records. Specifically, the defendant claims that the prosecutor's statement improperly shifted the burden to produce evidence to the defendant. Because these statements were in fair response to defense counsel's statements during closing argument, this claim fails.

Relief will be granted for prosecutorial misconduct during closing argument only where the unavoidable effect of the prosecutor's conduct is "to prejudice the jury so as to form in their minds a fixed bias towards the accused and to impede their ability to objectively weigh the evidence and render a true verdict." Commonwealth v. Begley, 780 A.2d 605, 626 (Pa. 2001). In Commonwealth

11

v. Sanders, the Superior Court found that "[o]ur courts have long recognized the principle of 'fair response' – that the prosecution may properly respond to defense arguments." 551 A.2d 239, 251 (Pa.Super. 1988), appeal denied, 559 A.2d 36 (Pa. 1989).

During closing argument, defense counsel stated:

> Remember what Miss Rindone said. She had her cell phone. She kept it when she went to the hospital. She made some calls. . . . Wouldn't you like to see her cell phone records to see who or how many people she talked to? Of course you would. It's that interim period while she has the cell phone and while she's at the hospital that is critical to this case. But you haven't seen that. Why the detective didn't take it, I don't know. Why he didn't subpoena cell phone records, I don't know.

N.T. 11/14/13 at 207.

The Commonwealth responded to defense counsel's arguments during its closing argument, stating:

> This one's phone records. That one's cell phone. **They have no burden to present anything. Never will. The burden is always on me.** By the way, they have the same subpoena power, so if they thought there was something relevant and important and helpful to the defense, that has no burden, from Kelly's cell phone records, from Ty's cell phone records, they can subpoena them, too.

N.T. 11/14/13 at 230-31. (emphasis added).

The Commonwealth's comments were in direct response to defense counsel's arguments that there were no cell phone records produced by the Commonwealth. These comments were in "fair response" to what defense counsel argued, and did not improperly shift the burden to the defendant. The Commonwealth explicitly stated that it had the burden of proof no matter what, and did not prejudice the jury to form a fixed bias towards the accused. Thus, this claim fails.

**5. This Court abused its discretion by admitting Kelly Rindone's statement as a "prior consistent statement" because she had given the statement in question *after* giving the statement on which she was impeached.**

The defendant claims that this Court erred in admitting Kelly Rindone's statement as a "prior consistent statement" because she had given the statement in question *after* giving the

12

statement on which she was impeached. Because the statement was admitted as a prior consistent statement in response to defense counsel's impeachment of the witness, this claim fails.

Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness after an opposing party has had the opportunity to cross-examine the witness about the statement and the statement is offered to rebut a charge of "fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose." Pa.R.E. 613(c). "It is well established that a trial court may, in its discretion, permit introduction of a prior consistent statement of a witness in order to rebut a claim of recent fabrication in the witness's trial testimony." Commonwealth v. Cruz, 414 A.2d 1032, 1036 (Pa. 1980). In Commonwealth v. Fielder, defense counsel impeached a Commonwealth witness by reading a portion of the witness's statement given to detectives a few days after the homicide. 612 A.2d 1028, 1030 (Pa.Super. 1992). The Commonwealth attempted to rebut this impeachment by having the detective read into evidence other relevant portions of the statement. Id. The Superior Court concluded that since parts of the statement had already been admitted through defense counsel's impeachment of the witness, the other relevant portions of the statement were admissible in their entirety as prior consistent statements. Id. at 1034, *citing* Commonwealth v. Marino, 245 A.2d 868 (Pa. 1968), cert. denied, 395 U.S. 983, rehearing denied, 396 U.S. 871 (1969).

Commonwealth witness Kelly Rindone testified on cross-examination that, to her knowledge, Bumpers was no longer in the drug dealing business after he returned from prison. N.T. 11/13/14 at 107. Defense counsel then impeached the witness with a statement she had made to detectives in the Homicide Unit on the night of the murder:

> MR. BOWE: Let's go to the last one on the page. "QUESTION: Was Tyreece involved in the drug business since his release from prison in March 2010?" "ANSWER: Yeah. He had his own clientele. When people saw him out of jail, they would buy from him when they saw him." Your words?
> MS. RINDONE: Correct.
> MR. BOWE: Your signature?

13

MS. RINDONE: That is my signature.
MR. BOWE: So, in fact, you did know he had gone back into the drug business after his release from prison; is that correct?
MS. RINDONE: That is correct.

Id. at 113-14; Exhibit C-6. Defense counsel further attempted to impeach Rindone regarding the timing of when she identified the defendant as Bumpers's killer:

MR. BOWE: Police officer comes, first one to talk to you. You tell that police officer, [h]ere's the guy's house right here, or words to that effect?
MS. RINDONE: Not right there. Not on the scene. No, I did not say anything until I got to Homicide. I was scared.
MR. BOWE: Well, you were also interviewed at the hospital by police officers; weren't you?
MS. RINDONE: Correct.
. . .
MR. BOWE: But, here's what I'm asking you. You know the guy's name, right?
MS. RINDONE: Right.
MR. BOWE: You know where he may be living, which is in sight of where you're standing talking to the officer; isn't that true?
MS. RINDONE: Correct.
MR. BOWE: Well, what I'm asking you is didn't you say five-foot, whatever your physical description was, description, description, description, his name is Juan and that's where the guy lives; you didn't say that did you?
MS. RINDONE: No, I did not say that.
MR. BOWE: In fact, the name Juan, it doesn't appear that you gave that to any police officer until you were already at the hospital; right?
MS. RINDONE: I was scared. I didn't know what to do. I never been [sic] in a situation like that before and I was scared to talk. I was scared.

N.T. 11/13/13 at 117-19.

In light of this impeachment, the Commonwealth introduced other relevant portions of Rindone's statement as a prior consistent statement. This statement was introduced through the testimony of Detective James Burns – one of the homicide detectives who had taken Rindone's statement. N.T. 11/13/14 at 79-89. Detective Burns read relevant portions of the same statement during his direct examination by the prosecutor.[15] Id.; Exhibit C-6.

---

[15] Detective Burns read the narrative portion of Rindone's statement, in which she recounted the events of the night of Bumpers's murder. N.T. 11/14/13 at 79-89. Specifically, the statement identifies the defendant as the man who killed Bumpers, and gives a detailed description of the defendant – "black male, about six-foot, dark complexion, skinny, braids. He has a tattoo on his arm with bricks, late 20s, early 30s . . . [wearing] [b]lue jeans and a blue collar shirt with yellow stripes." Id. at 83.

14

Because defense counsel suggested during cross-examination that Rindone was fabricating her testimony regarding her identification of the defendant as Bumpers's killer, her prior consistent statement was properly admissible to rebut impeachment of the witness. Thus, this claim fails.

For the foregoing reasons, the defendant's judgments of sentence should be affirmed.

BY THE COURT:

M. TERESA SARMINA      J.

15